May it please the court, Tammy Holt for appellant. The issue in this case is whether the siblings have both legal and equitable title to the Moore County farm. Legal title is undisputed, so the only issue that remains is whether the siblings have equitable title to the property. That's a quote from the siblings' trial brief the day before the stipulation was entered in this case. Two days after the stipulation, the siblings' proposed findings of fact included proposals that Archer had donated intent, that the siblings were the legal title holders, and that their actions established both legal and equitable title to the Moore County farm. Therefore, the issue in this case is and always has been whether Richard Archer Sr. had the intent to transfer ownership of the property to the siblings. The stipulation did not decide that issue in favor of the siblings, and clear and convincing evidence did establish that Archer had no intent required to convey the property. This court must reverse the lower court's decision because to make the conclusions it did, the lower courts got it wrong on the law and on the evidence and made conclusions inconsistent with their own findings. On the law, the courts got it wrong because there is a legal doctrine of beneficial ownership even though the bankruptcy court declined to apply one. It is not limited to mortgages and parent companies of title holding subsidiaries. In fact, the siblings admit that's the law. In siblings' briefing, they stated if the debtor, Richard Archer, had, quote, any legal or equitable interest in the purchased properties at the moment they filed their petition of bankruptcy, those interests became property of the estate at the moment the petition was filed. In addition to the law, the court got it wrong on the evidence. On the evidence, the court missed in its conclusions and findings, misstated facts and misapplied facts. I think one of the important facts that it misstated is that the lower courts gave this impression that these Archer siblings were young kids when that 1988 deed was signed and that as soon as they got established in their medical careers, they came back and started working on the farm. Those Archer siblings were . . . Richard Archer was the youngest. He was 15. The oldest was 29 when that deed was signed, and none of them, including the siblings at issue in this case, started making any payments on that farm until their 30s and their 40s. This is not the case that we were just kind of waiting to get established and then they came back to run the farm. They never came back to run the farm because Archer never transferred ownership interest in the farm to them. The court also misapplied things like the family farm agreement. Because the 1988 deed is woefully inadequate to transfer ownership, the bankruptcy court tried to shore that up by saying, well, let's look at this family farm agreement that was entered into about the same time. But that family farm agreement does nothing to show that Richard Archer intended to transfer the property. In fact, what that family farm agreement says is that the siblings are not allowed to sell, transfer or convey that property. It didn't set up any family legacy. The family farm agreement says when the last of the eight siblings dies, they have to sell that land and split the proceeds up among the remaining siblings. Under that family farm agreement, Richard Archer didn't have any duty to account to the siblings at all. He never paid them any profits under that agreement. Family farm agreement incorrectly, the lower court incorrectly used that family farm agreement as any evidence to show that Archer intended to convey ownership of the property. Okay, there's two different properties and I saw very little on the Randall. What's your argument on that one? There is not as much evidence in the record. The Randall County farm was primarily owned by one of the siblings, Richard Archer Jr. Down the road when older and that kind of thing. Down the road when he was older. The evidence, but there is no evidence in the record that that farm was treated any differently than the main Moore County farm. The only evidence Richard Archer had is I borrowed some money, but then he gave most of that money back to his dad and they used that same money to continue to farm that property the same way that the Moore County farm had been run. You'll remember there's also testimony from Richard Archer. He's the one of the siblings who said, I really kind of thought I was going to learn how to farm, but dad kicked me off of the Moore County farm when my three-year tenure as a new producer was up and he wouldn't let me farm that. There's no more evidence that he let him farm the Randall County farm than they ever let him farm the Moore County farm. There's no evidence. That's one of the places that that title stipulation does come into effect. What it was intended to do is help clean up the title issue in this case because they couldn't establish clean title, 30 deeds in 30 years, none of them establishing full portions of ownership. We don't know what grantors existed, what grantors didn't, so what the parties did agree in the stipulation is somebody owns it all, that includes the Randall County farm, and either the person who owns it all was Richard Archer on the day he filed bankruptcy or the siblings on the day he filed bankruptcy. The counsel, one thing that struck me is that the focus of these arguments have been upon the Bankruptcy Court. The Bankruptcy Court, this is an appeal from the United States District Court Judge, Judge Archer. Nobody's talking about that. If you look carefully at what he said, and it's very carefully framed, you'll see a response to much of what's being argued now. I'll just tell you that up front. The other structure, the Bankruptcy Judge, the necessity of Article III is reviewed by the United States District Court, obviously. That's the ultimate determination in that. That judge then went back and also made findings himself, and those aren't addressed. Your Honor, he did adopt, he simply adopted the findings of fact and conclusions of law of the Bankruptcy Court. I would argue this Bankruptcy Court, in this instance, was the trier of fact. That was who judged the credibility of the witnesses. That was who . . . we would have made those mistakes, and the Northern District of Court simply agreed, but without the benefit of anything other than the record, the mistakes that were made in interpreting the evidence and in evaluating the evidence. Those were made in the Bankruptcy Court, and so that's why that's primarily where . . . that's where the record was created. That's where we go back to, to look at the evidence, to let this court know there was clear and convincing error. The clear and convincing error was committed by the bankruptcy judge and adopted by the Northern District judge. In addition to misstating some of the facts, the court not only misapplied that family farm agreement, but it misapplied and gave undue deference to the only other activity that the court felt that the siblings engaged in were the fact that they received payments during the fraudulent crop scheme period, but they received payments from third parties. They received payments from the government, CRP payments. They received leases, payments from farmers. They received payments under wind and solar leases, but payments from third parties don't evidence Richard Archer's intent to sell the . . . to convey the property to his children. Payments from those third parties show nothing more than the siblings are the ones that held their legal titles. So when a third party looked up the deed records and queried who to send the check to, that's who they sent the check to. So that was a clear error on the part of the bankruptcy judge to . . . it was almost all he had, but he gave undue and incorrect deference to the fact that the siblings received payments from third parties because that's not evidence of anything other than their legal title, and in this case, that didn't transfer equitable or beneficial ownership. The lower court, in addition to being raw on the law and being raw on the evidence, they made conclusions inconsistent with their own findings of fact. Conclusion of Law 17 stated that from . . . this is the court's conclusion of law. From 1988 until Archer filed bankruptcy, he exercised primary authority over the management of the Moore County Farm and retained significant benefits and burdens of ownership, and two conclusions of law later, the court concluded that it was the sibling defendants who actually had maintained significant responsibilities and there was evidence that Archer transferred ownership to them. Again, those significant responsibilities include paying for some farm equipment, maybe paying for some cattle expenses, and receiving payments from third parties who didn't know who was actually working the land and all they knew was in the county records, that's where the title was. Isn't the interchange between a dad and his kids and among the kids and all that a little different than if I just wanted to walk into New Orleans and buy some property from some unknown person? Those are two very different animals, in my view, so the bankruptcy court kind of giving some deference to the dad is not that surprising given that a dad and his kids is a different animal, as I said, from just some random person showing up to buy something from someone. That deference was warranted. There's actually a presumption that there was a valid conveyance in the family relationship, but presumptions can be overcome. In this case, it absolutely was overcome by clear and convincing evidence. In looking at whether he went too far in giving that deference, for instance, look at the conclusions drawn from the family farm agreement as opposed to the actual text of the family farm agreement. Look at the conclusions. For example, one of the conclusions that the bankruptcy court made was that the defendant's fraud only lasted for three years, but their involvement in the land spanned decades. Well, there's no evidence in the record of that. What the siblings admitted to was 15 years of crop fraud, not three years. That's what's admitted in the record. This, quote, unquote, decades, spanning decades of involvement was, again, they got payments from third parties, and in their 40s, once the fraud scheme had developed, they started paying a few bills on the land. Absolutely entitled to deference, but at this point, this court needs to look at that and determine whether you have a firm conviction that a mistake has been made, that even though there was evidence to support it, there was evidence, but even though there was evidence to support it, this court can reverse if you have a firm conviction or belief of the truth of these allegations, which is that Archer never had any intent to transfer the actual ownership of that land to his children. Yeah, but another, given this is out in the Amarillo country, ranch land, this man was a rancher, and he had children, and one of the things that he faces with the cost of land is the reality that the pressure to deal with that state tax haven, he wanted that property kept for his kids. Because the kids were going off to med school and other places, he was taking care of that. So, consistent with these facts, you have a man that's trying to run this narrative out. What he wants to do, he wants the children to have title to this land, and he knows that they can't manage it itself, so he wants simultaneously to go to med school, go do these other things. That's fine, but we want the whole of the land, and I will manage the land. And so, as you read these facts and you look at the district judge's judgment, and not stop with the bankruptcy judgment, that's a perfectly plausible explanation. The pressure is on to him to get rid of that land. That's the reality of it. The land in that part of the country was selling good. He bought it at $4 an acre, and now you're talking thousands of dollars an acre. So, in other words, I was just suggesting to you there's a narrative here that is perfectly consistent with him wanting the title to be in his children, and him to manage it. That's what I'm saying to you. That would be the impulse, frankly, because it's common to the landowners and over the ranch country, throughout the hill country, throughout that whole thing. That's just the way it is. And he may have wanted to do that, but the evidence is that he didn't do that. He could have entered a valid deed in 1988 with an actual grantor and an actual grantee and recorded it, but Branch Archer testified he didn't even know that deed existed until this lawsuit was filed. Richard Archer, after that 1988 deed, turned around in 2006 and sold the same property to his kids, and in 2014, again, sold the same property to his kids. So, again, he could have actually sold it to him in 1988, but the evidence is that he didn't. That he didn't even think he had sold it to them because he's still selling it to them again and again once this crop fraud scheme starts, and he needs to now create a paper trail that makes it look a little more like he might have actually sold it to them. So, absolutely, I understand that that might have been an intention, but legally, some of the cases say these causes of action are . . . they're simple. If the district judge is . . . I'm sorry? Look again at what the district judge said, not what the bankruptcy judge said. There was confusion about the stipulation, et cetera. I would love to . . . the stipulation . . . You argue it as you wish. Well, I think you can decide this case. The stipulation is not a determining factor here. This was a suit to quiet title. This was an equitable suit, and even if the stipulation, which we think it did, conceded that legal title was being held by the children, that in no way affects their ability to bring the suit to quiet title. The suit to quiet title, he just had to establish that Archer had an equitable interest, that that interest was impeded by someone else, and that removing that cloud would restore the interest. All the stipulation does is meet the second element of a suit to quiet title. There has to be some challenge to Archer's interest, and the stipulation just signifies that challenge to his interest. Thank you. All right. Thank you. You've observed your rebuttal time. All right. Mr. Smithy? Good afternoon. I'm John Smithy. I'm representing the Appalese in this appeal. Judge Haynes, just to quickly address one of the issues that you raised, and that is there's a mention of a Randall County farm and a Moore County farm. The Randall County farm was originally included in the complaint that was filed, but the bankruptcy judge in his findings and conclusions in conclusion 22 said that this argument concerning Randall County farm was only raised in the complaint, however, no evidence was presented on the point. So it really kind of fell off the radar in the bankruptcy court. That was my point. I mean, my point is like, huh? It doesn't seem like Randall is really in play here, but your opponent thinks it is. And you're saying, no, it's really not, that Randall really was given to the son. Yeah, it wasn't really given. There was some dispute over how much. But the point is that Randall is a different, much clearer giving or selling or whatever the right term is, transferring to the son than the Moore. Yes, it was at a different time in 2008. Right, that's why I asked about it. She agreed that it wasn't as much in play, but seems to still be arguing about it. Yes, and in their brief, they didn't really get into the Randall County, and that's one of the things that confused us a little bit. So we did respond. We tried to in our appellee's brief to say that, no, this was a legitimate transaction for at least $800,000 of consideration that was passed from the son to the father. To me, it seems different. I'm not saying that they aren't both reversible or both affirmable. I'm just saying they seem different from each other. I think they're two separate transactions. You're absolutely right, Your Honor. Okay, so let's talk about Moore. I'm a little unclear why would he give a title in 1988, but then again two times later down the road? How does that make a lick of sense? If I sold a house 25 years ago, should I sell it again? Well, no, I already sold it. Well, I don't think the record is really clear about that. And frankly, we had no real reason to clarify the record because of the title stipulation and the pretrial order that had been entered. So I'll get to that in a second, but to address your question, Your Honor, and that is that this family signed a lot of deeds over the years. There was testimony of several dozen deeds among the siblings and from parent to sibling. And the only, I think the most logical answer based on the record is that he wanted to make sure, the father, that he had bestowed title to the children. And Judge Higginbotham, as you mentioned, this is not an unusual transaction, particularly in the Texas panhandle where this occurred. We have a lot of farmland. It's mostly dry farmland. A man can go pretty fast trying to farm dry land up in the Texas panhandle. We get maybe 16, 17 inches of rain a year. And so the land values have tended to escalate over the years, but the production has not. And so the value in this land is primarily from appreciation. It's not from the income that the land produces. And so one of the things that siblings testified to, of course the father had died prior so his testimony is not available, but the siblings had testified that we were more than happy for our father to continue farming this operation for two reasons. One, he was older in age and we wanted him to stay busy, engage. And the other thing is they said the value of the land was, if not enhanced, at least protected by keeping the farm in cultivation because, you know, once that land gets out of cultivation, it's very hard to get back in cultivation. You have weeds, you have erosion, you have other problems. And so to preserve the value of that farmland, you really need to keep it cultivated and farmed and harvested every year. So back, though, once again to the question, and that is I think the only logical explanation, he wanted to make sure the children had title to the property because he had several entities, he had his retirement plans, he had LLCs, they had their retirement plans, the siblings did. So I think he was trying to make sure that title was where he wanted it to be. Now one thing that I think I should address, and that is the nature of the cause of action, I think to properly analyze all this we have to kind of analyze what cause of action we're talking about here. And so you go back to the pleading. The original complaint was basically just what counsel said, and that is the complaint said legal title is vested in the siblings, but we, or the trustee, said I have equitable title on behalf of the estate. Now that's a concept that Texas recognizes, of course, the separation of legal and equitable title. And as a general rule, you know, I think it's fairly clear that equitable title will trump legal title if you can prove equitable title. And the way to do that in Texas, there's really only one way, it's with a trespass to try title suit. If I claim I've got equitable title and you claim you've got legal title, that's the only way I can get from here to there to try to acquire the court to tell me I have legal title is with a trespass to try title suit. That's, as the court's aware, that's a statutory action in Texas. It's covered in the property code. And there are certain elements of pleading and proof that a party has to meet. I mean, to put it very simply or shortly, you have to show that you have, to be a plaintiff in that case, you have to show that you have title, legal title, and you have to show equitable title at the very least. And generally, to do that, you have to show, there's four ways that Texas courts recognize proving title, but one of the things that the bankruptcy court pointed out, and I think the district court affirmed in its findings, was that there was no proof of title here in Archer, in Richard Archer Sr., the father. In other words, what he asked the court to do, and what the trustee asked this court to do, in the trustee's prayer to this court in the brief, is to order that all interest in the property are owned by the bankruptcy estate and order the siblings to execute deeds. Well, the court can't really use its prestige to do that without some evidence and some proof of who owns the property. You've got to say, you've got to have evidence that you own the property, and as the bankruptcy court pointed out, the district court emphasized, that proof's not here in this case. And so, under Texas law, if a plaintiff in a trespass to try title case fails to prove good title in the plaintiff's name, then the only proper result is a take-nothing judgment at that point, which is exactly the substance of what the district court rendered in this case. So, we have this situation where we have a trespass to try title case, and it came down, this was true in their complaint, it was true in the pretrial stipulation and in the pretrial order, that what this case is going to be based on is, does the plaintiff, a trustee on behalf of the debtor who's now deceased, does that trustee have equitable title in the property? Well, Texas has a very narrow view of what constitutes equitable title. Now, you can have an equitable interest or you can have an equitable right in property, but that's not equitable title. An equitable interest or an equitable right will not form the basis of a trespass to try title case. You have to have equitable title. And the bankruptcy court hit, I think, on the right definition, the proper definition of what equitable title is. It's the right upon the occurrence of a condition or event to compel legal title, and the equitable title holder can compel legal title be delivered to them upon the occurrence of an event or a condition. Now, the most common of those would be a mortgage or mortgagee relationship, where you have in Texas a deed of trust, where upon a condition, which is the mortgage or fails to pay the note, then the mortgagee can compel legal title without any judicial action. It's an extrajudicial compulsion of title. Texas also recognizes a contract for deed where title remains in the seller, but once the buyer has fully paid or complied with all obligations of the contract, then at that time the buyer acquires equitable title and can compel the seller to deliver title. Now, one thing that I think is significant is that equitable title, proof of equitable title is subject to the statute of frauds in Texas, just as legal title would be. In other words, you have to have some signed document in writing to do that. There's only one exception that I'm aware of in Texas cases, and that's a purchase money resulting trust, because it's not truly a trust even though it's called a trust. So if you have a purchase money where A gives B the money to purchase the property and B goes and buys the property in B's name, A says, wait a minute, that's my money that bought that. That's a purchase money resulting trust, and A has equitable title and can prove it by parole evidence. He does not have to comply with the statute of frauds. So that's the difference between legal and equitable title. Now, one court has said, or several courts have said, that the test is whether the plaintiff would have to go into court and get some kind of judicial cancellation or modification of a document in order to get title. And if they do, they don't have equitable title. They have to file an equitable action first. If they win that, then . . . One question I have is whether the bankruptcy court and then the district court that affirmed that relied too much on the stipulation of the legal title and not enough on looking at whether it was truly equitable. Well, first of all, I think the benefit of the stipulation and the pretrial order was to narrow the issue in the case. And so basically the case, the starting point of the case was, okay, the siblings have legal title. Now, can the trustee prove equitable title? And once again, equitable title is different from an equitable interest. And so there's no evidence, no evidence of any document where the father ever tried to keep the right to get legal title back in his name. There's no evidence that he had any legal right to compel the children to give the property back or to convey it back. Without that, there's no equitable title because that, by definition, is what equitable title is. And so the question is, what basis would the father have had to compel the children to return title to himself? There's no evidence of any basis. I think the other thing that's significant is there is no evidence in the record of any wrong motivation that the father had for giving the property to his children. In other words, no evidence that he was trying to hide from a creditor. At that time, that was 30 years before he filed bankruptcy, at least about 30 years. And there's no evidence of any motivation that the father would have had to transfer this property to his children other than the normal event where a father would want to convey property to his or her mother during her lifetime to their children. So there's no outstanding motivation other than that. Judge Haynes, I think what's significant is there was a stipulation in the pretrial order. But in the pretrial order, they wanted to come in and show that one of those deeds was void, the 1988 deed was void. And we objected to that. We both orally and in writing objected. The bankruptcy court noted that in its findings that we had objected to any evidence based on that stipulation. But basically what the district judge said is it doesn't matter, it's not relevant to anything because even if the 1988 deed had been void, we have these two other deeds and we have a stipulation that legal title passed to the children. And so whether the 1988 deed is void or not is really not at issue in this case by virtue of where we started the case, where we started this controversy. So as far as the father's continued farming of the property, I will say... 1988 was the only one before all that frauding of the insurance, right? Well, not necessarily, Your Honor. The criminal record was included in this. It was an unfortunate event where the father came up with this crop insurance scheme and he had all of his children and his grandchildren and all of his employees sign on as producers. He told them it was to get crop insurance. And what happened is one of the employees got a 1099 for a bunch of money that he never got and so he starts asking questions and pretty soon it's prosecuted as a criminal case. The children were in a position where they weren't really a part of it other than signing documents, but they took full responsibility. They should have signed documents knowing better what those documents were. They pled to those charges. They paid the restitution. That's been done. It is what it is. But the thing about it was any producer, you had to certify you were a new producer, which is what the children certified they were, even though the father was farming the property. You can only be a new producer for three years. And so even though this scheme of the father's went on for 10 years or more, each of the children only signed papers for three years at a time. So these activities, just like the bankruptcy court found, and the undisputed evidence, was these activities preceded that by a number of years. They go all the way back to the 1990s. As far back as 2005, the children were leasing out parts of this farm to third parties. As far back as the early 2000s, they were signing wind energy leases on the property. And so there had been a considerable amount of involvement. And the bankruptcy court relied to some extent on the Woodworth case, which is in both briefs. I know it's in our brief. It's a Texas case that says, okay, if you have a father gifting property to a child, particularly the father, to show that it's not a legitimate sale or an actual intent to deliver the deed, you have to have complete responsibility for ownership in the father. If there's any shared responsibility, that's the Woodworth case, if there's any shared responsibility, that's not clear and convincing evidence that's necessary to overcome that presumption of a donative intent from parent to child. So that's where we end up on that. So they really don't have an argument that it was equitable title. There's no document that would show they have equitable title. There's no evidence of any of the circumstances that would put equitable title in the plaintiff. And without that, with the legal title in the name of the defendants, there's really no, there's no other choice than to say that a legal and equitable title vests in the defendants, in this case the siblings, the children of Richard Archer Sr. Any other question? I'll be glad to address. Thank you, Your Honor. Thank you. All right. Back to you, Ms. Hope, for rebuttal. First of all, appellants were not limited to a trespass to tri-title suit. They brought in the alternative, an action to quiet title to the property, which does not have a statute of limitations. Texas Supreme Court has been clear that as long as there is a clout on title, there's an equitable remedy to remove the clout on title. And courts in this district, the Rumens case and the Coffey case have both clearly distinguished between the difference between a statutory cause of action, trespass to tri-title, and an equitable cause of action, a suit to quiet title. And there's no dispute to meet the elements of either trespass to tri-title or quiet title that Archer owned property, had title to this property. The siblings don't dispute that. The siblings come into court and say they take title from Richard Archer. So they have never disputed that prior to 1988, Richard Archer had title in the property that he attempted to convey. Judge Higginbotham, I would not at all disagree with you that it may not be an unusual circumstance at all for a father to want to deed property over and maintain management of it. I would submit to you that the terms of this particular family farm agreement might be very unusual when a manager doesn't have to account to the owners for what he's doing on the property, when the manager for 30 years doesn't pay any profits to the owners on the property. If the manager tells the owners of the property they can't sell or convey it during their lifetime and what to do at the end of the lifetime. So I would agree with you. It's not unusual for there to be an owner and a manager. That's not this situation. In this case, Richard Archer did not act like a simple manager. The clear and convincing evidence is that he retained ownership. He continued to act as an owner in addition to managing the property for the interest of his grown 30, 40-year-old children. Justice Haynes, I would clarify. I would perhaps take a little different spin on the stipulation and not necessarily that the district court relied on it too much but that the district court relied on it incorrectly because the district court and the bankruptcy court and the district court apparently relied on the stipulation not just to establish legal title like it did but to also establish that it conveyed ownership. And conveying ownership doesn't happen just with transferring legal title. It happens with delivering title, which requires an intent to convey ownership, which requires an abandonment of the elements of ownership to the people that you've actually sold the property to. So it wasn't just a fact of relying on it too heavily, but it was relying on it incorrectly in ways that the siblings, their own documents. I'd point to the court in the record at 158, 298, 329, and their own findings of fact. Those are all places where the siblings themselves told you what stipulation meant. They told you that equitable ownership had not been determined, and so it was incorrect for the district court to elevate the stipulation to deciding the substantive issues in this case. As this court held in the Dodge versus American Honda case, on which Justice Higginbotham and Justice Stewart sat, when we want to know what a stipulation means, we look at the intent of this. It's just a contract. We look at the intent of the parties, and we look at the context in which it's entered into. And in that case, the parties had stipulated that the employees were terminated, so the defendant moved for summary judgment and said, hey, you stipulated you've been terminated, therefore you get termination benefits under the contract. And the court said, stipulating to the fact of termination is not the same thing as stipulating to the effect of termination under this particular contract. Same in this case. Stipulating to the fact that there is a piece of paper or pieces of paper that legal title has passed did not stipulate to the fact that in addition to legal title, equitable ownership and actual conveyance of the property had occurred. Justice Haynes, I would also point the court to the fight on the Randall County farm. Again, the stipulation, its intent was to clean up all of the issues. There were either four or five counties, I'm misremembering, where there was a motion for summary judgment by the defendants, and those were removed from the case because they did establish that those had been conveyed by Archer to one or more of the siblings prior to the filing of bankruptcy, so they were removed from the case. So when there was evidence of an actual transfer of ownership, those properties were removed. But that doesn't count the Randall County farm. Findings of Act 45 to 51 and conclusions of Law 22 to 25. It's not as much. It's not as big. It wasn't all the siblings. It wasn't the length of time, so the evidence isn't as extensive. But there is no evidence that Richard Archer intended to convey ownership of that property either. All right, thank you. All right, thank you, counsel, on both sides. It's an interesting case, to put it mildly. The case will be submitted, and we'll get it decided. Thank you. All right, we call up our fourth case for argument today.